## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

PENSION BENEFIT GUARANTY )
CORPORATION )
1200 K Street, N.W. )
Washington, D.C. 20005 )
)
         Plaintiff, )    Civil Case No.:  1:18-cv-864
)
   v. )
)
)
HERITAGE MINISTRIES CHARITABLE )
CARE NETWORK, INC. )
3017 North Main Street )
Jamestown, NY 14701 )
)
        Defendant. )

## COMPLAINT

1.    This action arises under Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1301-1461.

2.    Plaintiff Pension Benefit Guaranty Corporation ("PBGC") brings this action under 29 U.S.C. § 1303(e)(1) with respect to the Heritage Village Pension Trust (the "Plan") to enforce the provisions of Title IV of ERISA and to enforce a final PBGC agency determination that violations of Title IV of ERISA have occurred.

3.    This is an action for enforcement of PBGC's final agency determination based on review of the agency's administrative record, pursuant to 5 U.S.C. § 706.[1]

---

[1] PBGC will file the administrative record under seal forthwith.

**Jurisdiction and Venue**

4.      This Court has jurisdiction over this action under 29 U.S.C. § 1303(e)(3), as well as under 28 U.S.C. §§ 1331 and 1345.

5.      Venue is proper in this Court under 28 U.S.C. § 1391 and 29 U.S.C. § 1303(e)(2).

**Parties and the Plan**

6.      Plaintiff PBGC is a wholly owned United States government corporation established under 29 U.S.C. § 1302, and is the federal agency that administers and enforces the nation's defined benefit pension plan insurance program established by Title IV of ERISA.

7.      Defendant Heritage Ministries Charitable Care Network, Inc. ("Heritage") is a New York not-for-profit organization that provides independent living, assisted living, skilled nursing, outpatient therapy, dementia care, and rehabilitation services to seniors.  Heritage's principal place of business is in Jamestown, New York.  Heritage is the successor to The Gerry Nursing Home Company, Inc.  ("Gerry").

8.      The Plan was established effective July 1, 1973, by Gerry to provide pension benefits to certain employees of Gerry and Gerry Homes Management Company, Inc.

9.      The Plan is a single-employer, defined benefit pension plan covered under Title IV of ERISA.  *See* 29 U.S.C. § 1321.

10.      Heritage is the Plan's contributing sponsor within the meaning of 29 U.S.C. § 1301(a)(13).

11.      Heritage is also the Plan Administrator within the meaning of 29 U.S.C. §§ 1301(a)(1) and 1002(16).

**Factual Background**

**Statutory Background of ERISA Title IV Standard Terminations**

12.     Title IV of ERISA provides the exclusive means to terminate a defined benefit pension plan, and PBGC regulates such terminations, *see* 29 U.S.C. §§ 1341, 1342; one means is by a "standard terminations."  29 U.S.C. § 1341(b).

13.      In a standard termination, the plan administrator must allocate and distribute assets to plan participants and beneficiaries in accordance with 29 U.S.C. §§ 1341 and 1344.

14.     In a standard termination, the plan's assets must be sufficient for benefit liabilities as determined under the plan provisions in effect *on the plan's termination date*.  29 U.S.C. § 1341(b)(1)(D).

15.     Amendments adopted after the date of plan termination that decrease benefits and are unnecessary to meet the tax qualification requirements of the Internal Revenue Code ("IRC") are prohibited.  29 C.F.R. § 4041.8.

16.     The plan administrator must distribute the plan's assets by (a) purchasing "irrevocable commitments" (i.e., annuities) from a private insurer to satisfy all benefit liabilities, or (b) an alternative form of distribution (e.g., a lump-sum payment) "in accordance with the provisions of the plan and any applicable regulations . . ."  29 U.S.C. §§ 1341(b)(3)(A)(i), (ii).

17.     IRC Section 417(e)(3) sets forth the required actuarial assumptions for calculating the *minimum* present value of a lump sum benefit.  Specifically, two actuarial assumptions are used to calculate the present value of a lump sum benefit: interest and mortality.

18.     IRC section 417(e)(3) was amended by the Retirement Protection Act of 1994, P.L. 103-465, to specify new statutory interest and mortality assumptions (30-year Treasury interest rates and the 1994 Group Annuity Reserve mortality table (collectively "GATT Assumptions")) for calculating minimum lump sum benefits.

3

19.     IRC section 417(e)(3) was again amended by the Pension Protection Act of 2006 ("PPA"), P.L. 109-280.  The amendment specified new statutory interest and morality assumptions (segment interest rates derived from a corporate bond yield curve and a mortality table to be prescribed by the Secretary of the Treasury (collectively "PPA Assumptions")) for calculating minimum lump sum benefits.

20.     The present value of lump-sum benefits paid in a standard termination must be valued as of the date of distribution.  29 C.F.R. 4041.28(c)(2).

21.     In a standard termination, the plan administrator is required to provide notice to plan participants of the intent to terminate the plan ("NOIT"), 29 U.S.C. § 1341(a)(2), (b)(1)(A), which must state that the Plan is to be terminated and include a proposed date of plan termination.  29 C.F.R. § 4041.23(b)(2).

22.     Before distributing any plan assets, the plan administrator must send PBGC a "Standard Termination Notice – PBGC Form 500" ("Form 500"), which contains, *inter alia*, information about plan assets and benefit liabilities.  *See* 29 U.S.C. § 1341(b)(2)(A); 29 C.F.R. § 4041.25.

23.     Once plan assets are distributed, the plan administrator must file a "Post-Distribution Certification for Standard Termination – PBGC Form 501" ("Form 501"), attesting that all benefits under the plan were paid in accordance with Title IV of ERISA.  *See* 29 U.S.C. § 1341(b)(3)(B); 29 C.F.R. § 4041.29.

24.     Following receipt of the Form 501, PBGC retains authority regarding matters relating to the plan.  29 U.S.C. § 1341(b)(4).  PBGC is required, under 29 U.S.C. § 1303(a), to audit a statistically significant number of standard terminations to determine if participants entitled to a benefit have received their full benefits under the terms of the plan and applicable law.

25.     PBGC's standard termination audits are subject to review under PBGC's administrative review procedures.  29 C.F.R. §§ 4003.1(b)(3)(iii), 4003.21-4003.35.

### The Standard Termination of the Plan

26.     On or about April 15, 2013, Heritage issued a NOIT to participants and beneficiaries with a proposed termination date of June 30, 2013 ("Termination Date").

27.     On September 4, 2013, PBGC received a Form 500 from Heritage for the Plan's standard termination pursuant to 29 U.S.C. § 1341(b).

28.     Under Plan Section 6.4, pension payments under the normal form would be sent to participants monthly if participants did not elect one of the optional forms of pension and if the Qualified Joint and Survivor Annuity did not apply.

29.     Under Plan Section 6.5, participants could elect to receive pension payments in an optional lump sum form that was equal to the "Actuarial Equivalent" of his Accrued Benefit under the Plan.

30.     On October 8, 2009, the Plan was amended (effective January 1, 2008) to adopt the PPA Assumptions for determining Actuarial Equivalents (the "First PPA Amendment").  Specifically, Section 1.2 of the Plan was amended to define "Actuarial Equivalents" under the Plan to be determined using  the "adjusted first, second and third segment rates [derived from a corporate bond yield curve] determined by the Secretary of the Treasury for purposes of [Internal Revenue] Code Section 417(e)(3) for the first calendar month of the Plan Year in which occurs the Annuity Starting Date[,]" and the  applicable mortality table specified by the Secretary of the Treasury under IRC section 417(e)(3).

31.     Thereafter, on July 3, 2012, Heritage executed an amended and restated Plan (the "2008 Plan Restatement"), effective January 1, 2008.

5

32.     Section 1.2 of the 2008 Plan Restatement specified that the Plan's "Actuarial Equivalent" of a participant's benefit was to be determined using the GATT Assumptions.

33.     On March 15, 2013, while the 2008 Plan Restatement was in effect, Heritage executed a Plan amendment that terminated the Plan as of June 30, 2013 (the "Termination Date").

34.     On September 9, 2013, over five months after the Plan's Termination Date, Heritage amended Section 1.2 of the Plan to again adopt the PPA Assumptions (the "Second PPA Amendment").

35.     No later than June 15, 2014, Heritage paid lump sum benefits due on Plan termination that were calculated using PPA Assumptions, not the GATT Assumptions required on the Plan's Termination Date.

36.     On May 27, 2014, Heritage purchased a group annuity contract from Companion Life Insurance Co. to pay future benefits due Plan participants.  Lump sum options under that contract are again valued using PPA Assumptions, not the GATT Assumptions required on the Plan's Termination Date.

37.     On July 17, 2014, PBGC received a Form 501 from Heritage that purported to certify that all benefit liabilities under the Plan were calculated correctly in accordance with ERISA's provisions and regulations, and that all benefit liabilities under the Plan were satisfied.

38.     By letter dated November 20, 2014, PBGC notified Heritage that the Plan's termination had been selected for audit pursuant to 29 U.S.C. § 1303(a).

39.     On April 24, 2017, PBGC issued an initial determination letter with respect to its audit (the "Initial Determination").

40.     The Initial Determination found that Heritage must distribute additional assets to participants to comply with Plan provisions and applicable laws.  Specifically, the Initial

Determination found that the Second PPA Amendment adopted after the Plan's termination date decreased benefits in violation of 29 C.F.R. § 4041.8.

41.     Accordingly, PBGC's Initial Determination required that Heritage recalculate all Plan participants' lump sum values so that participants receive the higher of:

(a)     the 30-year Treasury rate in effect for November 2012 (2.80%, for distributions that occurred in 2013) and for November 2013 (3.80%, for distributions that occurred in 2014), along with the 1994 GAR Table; or

(b)     the November 2012 segment rates in effect for the 2013 Plan year (1st – .97%, 2nd – 3.50%, 3rd – 4.60%) along with the 2013 Applicable Mortality table for distributions that occurred in 2013 and the November 2013 segment rates in effect for the 2014 Plan year (1st – 1.19%, 2nd – 4.53%, 3rd – 5.66%) along with the 2014 Applicable Mortality table for distributions that occurred in 2014.

42.     The Initial Determination also required Heritage to amend Appendix A of the Annuity Contract to provide that future lump sum benefits would be calculated using whichever set of assumptions as described in paragraph 41 of this Complaint) provided the larger lump sum benefit.

43.     On May 26, 2017, counsel for Heritage submitted a written reconsideration request of PBGC's Initial Determination (the "Reconsideration Request").  In its Reconsideration Request, Heritage asserted that the 2008 Plan Restatement did not nullify the First PPA Amendment.  Thus, Heritage argued that the use of PPA Assumptions to calculate lump sum benefits paid on Plan termination and future lump sum payments under in the Annuity Contract was in accordance with the Actuarial Equivalents in effect under Plan section 1.2 on the Termination Date.

44.     PBGC issued a final determination letter on August 24, 2017 and an amended final determination letter on April 9, 2018 (collectively, "Final Determination") that upheld its Initial Determination.[2]

45.     The Final Determination concluded that Heritage's arguments in its Reconsideration Request provided no defense to PBGC's Initial Determination because the 2008 Plan Restatement nullified the First PPA Amendment and the Second PPA Amendment was adopted after the Termination Date.  Accordingly, the 2008 Plan Restatement was in effect on the Termination Date, and GATT Assumptions must be used to calculate lump sums paid on termination and in the future under the Annuity Contract.  Moreover, using the PPA Assumptions adopted under the post-termination Second PPA Amendment, rather than the provisions in effect on the Termination Date, decreased Plan benefits in violation of 29 C.F.R. § 4041.8.

46.     On information and belief, as of the date of the filing of this Complaint, none of the additional benefit payments required by PBGC's Final Determination have been made to Plan participants and beneficiaries; nor has any necessary corrective action been taken with respect to the Annuity Contract.

## CLAIM FOR RELIEF

47.     PBGC repeats and re-alleges paragraphs 1-46.

48.     Heritage did not complete the standard termination of the Plan by valuing and distributing assets in accordance with the Plan provisions in effect on the Plan's Termination Date and applicable law.

---

[2] The amended final determination letter corrected typographical errors and amended a citation.

49.     The Second PPA Amendment violates 29 C.F.R. § 4041.8 because it was adopted after the Termination Date and it decreases lump sum benefits. 29 C.F.R. § 4041.8.

50.     Because lump sum benefits were not valued as of the date of distribution using the GATT Assumptions in effect under the Plan on the Termination Date, Heritage has not fully provided all benefit liabilities under the Plan as required by 29 U.S.C. § 1341.

51.     Because the Annuity Contract has not been amended to include GATT Assumptions in the calculation of future lump sum benefit payments, Heritage has not provided all benefit liabilities under the Plan as required by 29 U.S.C. § 1341.

52.     Pursuant to 29 U.S.C. §§ 1303 and 1341, Heritage is liable for additional distributions to Plan participants and beneficiaries, and must amend the Annuity Contract in accordance with PBGC's Final Determination.

WHEREFORE, PBGC respectfully requests that this Court:

   i.     Enter judgment in its favor against Heritage that enforces PBGC's Final Determination and requires Heritage to fully comply with the provisions of Title IV of ERISA as set forth in PBGC's Final Determinations;

   ii.    Award PBGC all of its costs of litigation in this case pursuant to 29 U.S.C. § 1303(e)(5); and

   iii.   Grant such other legal or equitable relief as shall be just and proper.

Respectfully submitted,

Dated: August 6, 2018                  By: /s/ Simon J. Torres
       Washington, D.C.                JUDITH R. STARR
                                       General Counsel
                                       KARTAR KHALSA
                                       Deputy General Counsel
                                       SARA B. EAGLE
                                       Assistant General Counsel
                                       SIMON J. TORRES

TERESA N. SAUNDERS
Attorneys
PENSION BENEFIT GUARANTY
CORPORATION
Office of the General Counsel
1200 K Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 326-4020, ext. 6074
Fax:  (202) 326-4112
Emails: torres.simon@pbgc.gov and
        efile@pbgc.gov

*Counsel for Plaintiff Pension Benefit Guaranty
Corporation*